(C.D. 4419)

Inter-Maritime Forwarding Co., Inc. *v.* United States

---

(Decided April 27, 1973)

*Allerton deC. Tompkins* for the plaintiff.

*Harlington Wood, Jr.,* Assistant Attorney General (*Herbert P. Larsen,* trial attorney), for the defendant.

RAO, Judge: The merchandise involved in this case is described on the invoice as "Self Adhesive Tape" – "Black Polythene Electrical Ref. 1409." It consists of black tape with an adhesive coating on one side, measuring ¾ inch by 22 yards, imported in rolls. It was assessed with duty at 20 per centum ad valorem under item 790.55, Tariff Schedules of the United States, as pressure-sensitive tape and is claimed to be properly dutiable at 10 per centum ad valorem under item 773.30, as an electric insulator of rubber or plastics.

The pertinent provisions of the tariff schedules are as follows:

| | | |
|---|---|---|
| 773.30 | Electric insulators, of rubber or plastics____ | 10% ad val. |
| * | *　　　*　　　*　　　*　　　*　　　* | * |
| 790.55 | Sheets, strips, tapes, stencils, monograms, and other flat shapes or forms, all the foregoing articles (except articles provided for in item 790.50) which are pressure sensitive, with or without protive liners, and whether or not in rolls____ | 20% ad val. |

At the trial Fred Devan, executive vice-president of Devon Tape Corp., the importer herein, testified that the instant merchandise is made of polyethylene film and a pressure-sensitive black adhesive. The adhesive is a natural rubber thermoplastic adhesive system which contains inorganic fillers, tackifiers and plasticizers. The witness stated that both the plastic sheeting and the adhesive were electrical insulating materials and that the tape produced therefrom was ready for use in its imported condition as an electric insulator. It it used primarily to insulate copper wire at the point where two wires are

being joined together or applied and to wrap around the handles of pliers which will be used on live electrical wires. The tape is particularly suitable for electrical insulation because of its high dielectric breakdown and high insulation resistance. It is also flexible, pliable, and highly conformable. It is resistant to moisture, chemicals, oils, aging, and dry-out, and is electrically pure, containing no sulphur or other corrosive ingredients.

Mr. Devan testified that the imported merchandise is pressure-sensitive tape and is sold as such. It is not described in his company's literature nor sold as an electric insulator. When used, it becomes insulation for an electrical conductor. It can be removed but it would ordinarily not be reused. The length of tape used in an application varies from 1 to 3 feet or 1 to 2 yards. The tape could be used for other than electrical applications but in fact is very rarely so employed.

The witness stated that he was familiar with other electric insulators, naming polyester tubing, polyester sheets, certain electrical impregnated papers, and certain chemicals, such as varnishes, epoxy, resins, and dips.

His firm handles many pressure-sensitive tapes, including packing tapes, reinforced filament tapes, double-coated tapes, transparent tapes, protective tapes, red lithographers' tapes, marking tapes, and cotton tapes. The present merchandise falls within a sub-category, known as electrical insulating tapes. A brochure, dated October 15, 1970 (exhibit A) issued by his firm, contains a heading "Specialty Electrical and Vinyl Insulating Tapes." While it does not list thereunder the instant merchandise, which was imported in 1964 and has been discontinued, it does list another product with a different plastic backing used for the same basic purposes, electrical insulation.

Defendant's first witness was Kurt W. Kuenzle, area sales manager of the Minnesota Mining and Manufacturing Company, which manufactures, *inter alia*, pressure-sensitive tape. The witness produced samples thereof, received in evidence as exhibits B and C. He said that exhibit B is a Scotch 33+ brand vinyl plastic electrical tape, used for the same purposes as the imported merchandise. Exhibit C is a black, ten-mill, vinyl tape called Scotchrap that is used as corrosion protective tape for underground gas lines and pipes, which may be exposed to chemical vapors. It has a different type of adhesive from exhibit B, but the two do not differ markedly. They are basically the same in their electrical insulating properties. Exhibit B is used in electrical applications but also to tie the ends of ropes and to patch swimming pools.

The witness testified that he had heard exhibit B described in the trade as electrical tape, electrical insulating tape, and insulation, but not as an electric insulator. He had sold products commonly known as

insulators in the electrical trade and produced two samples, received in evidence as exhibit E, a porcelain termination kit, and exhibit F, a single conductor termination kit. Each kit contains a number of articles and materials. The witness called the accordion-like segment of exhibit E, which is made of porcelain, a cable terminator, termination, pot head, or insulator. Exhibit F is also called a cable terminator and is known in the trade as an electric insulator of plastic. Both exhibits, as entireties, are sold as electric insulators, but each part is not itself an electric insulator.

Mr. Kuenzle would not identify exhibit B as an electric insulator of rubber or plastics, but as electrical insulation, a roll of plastic tape that has electrical insulation properties. He had never heard any such tape described as insulators of plastic.

According to the witness, exhibits E and F are designed for use with high-voltage electric current, whereas material like exhibit B is used with low-voltage current to prevent the escape or transmission of electricity through the tape. The latter would not be used as primary insulation with high-voltage current.

Defendant's second witness was Lee Stuart, Electrical Engineer General, Corps of Engineers, United States Army. He has a degree in electrical engineering, and has worked as an electrician and as an electrical designer. He testified that an electric insulator is a product made to insulate and support bare wires. It can be removed, relocated and reinstalled. It may be made from any insulating material. An insulator is equipment, a piece made for a specific purpose, bought and sold under the name of insulator. Tape, on the other hand, is material, and is bought and sold as tape. While in a broad sense, electrical tape acts as an insulator, it does not become an electric insulator in his opinion. It would be misleading to refer to it as such. He would not accept the imported merchandise as an electric insulator of plastic.

The witness considered the cable terminator, exhibit F, to be an electric insulator. Other articles which he regarded as insulators are depicted on pages 182 and 183 of Graybar Condensed Catalog No. 29 (exhibit H). He said they were known as insulators in the industry and that if he asked for insulators, they were what he would expect to get. He said that tapes and insulators are treated separately in the Corps of Engineers Guide Specifications which he uses.

The record shows and the parties are in agreement that the imported merchandise is plastic pressure-sensitive tape chiefly used for electrical insulation purposes. The question is whether such tape falls within the provision for electric insulators of rubber or plastics, and if so, whether it is more specifically provided for as such than as pressure-sensitive tape.

Merchandise the same as that involved herein was before the court in *Devon Tape Corp.* v. *United States*, 57 Cust. Ct. 507. C.D. 2856 (1966), which arose under the Tariff Act of 1930. That record has been incorporated herein and is summarized in the opinion of the court. The merchandise had been classified under paragraph 923 of the Tariff Act of 1930, as modified, by similitude to manufactures of cotton, not specially provided for. It was held similar to rubber tape used in the electrical trade for wrapping and insulating electrical wire splices and connections and therefore classifiable by similitude under paragraph 1537(b), as modified, as insulating materials composed wholly or in chief value of rubber.

The law applicable here is different, however, in that the Tariff Schedules of the United States contain a specific provision for pressure-sensitive tape, not found in the Tariff Act of 1930, and one for electric *insulators* of rubber or plastics, rather than one for molded *insulators and insulating materials* of rubber or gutta-percha.

Plaintiff claims that the provision for electric insulators, item 773.30, *supra*, is a use provision and covers tape chiefly used for electrical insulation purposes, whereas defendant claims that said item is an *eo nomine* provision and covers articles or devices rather than materials, citing *Naftone, Inc.* v. *United States*, 67 Cust. Ct. 341, C.D. 4294 (1971). In that case the merchandise consisted of rolls of plastic film, not over 15 inches wide, designed for and used as a dielectric in capacitors to separate the electrodes. The court held that the merchandise was an electrical insulating material and that the provision for electric insulators of rubber or plastics was applicable only to such articles or devices as were insulators, but not to the electrical insulating material from which they were made.

Plaintiff claims that the instant tape is more than a material; that it is made from insulating materials and is ready for use in its imported condition.

The issue turns on the meaning of the term "electric insulators," as used in the tariff schedules.

The term "insulator" has been defined by lexicographers and technical authorities, broadly, as a substance or material that is a nonconductor of electricity, heat or sound, which is used to inhibit or stop the passage of electric current, and, more narrowly, as a device, article or appliance used to separate electrical conductors and often to support them. *Websters' Third New International Dictionary* (1966 ed.); *Funk & Wagnalls New Standard Dictionary* (1952 ed.); *Reader's Digest Great Encyclopedic Dictionary* (1966 ed.); *Modern Dictionary of Electronics* (1972 ed.); *Chamber's Technical Dictionary* (1949 ed.); *The Encyclopedia Americana* (1953 ed.), Vol. 15, p. 175b;

*The Harper Encyclopedia of Science* (1963 ed.), Vol. 2, p. 610; *Encyclopedia Britannica* (1951 ed.), Vol. 12, p. 451.

> *Funk & Wagnalls New Standard Dictionary* states, for example:
>
> insulator * * * (1) A substance that is a non-conductor of electricity, heat, or sound, as cotton, gutta-percha, silk, and rubber, the dielectrics most commonly used for covering wires conveying electric currents.
>
> * * * * * * *
>
> (2) A device made of an insulating substance, for preventing the passage of electricity, heat, or sound.
>
> For practical purposes insulators are made in a variety of different forms adapted to the particular purpose in view, as the *double-cup insulator*, a device for insulating electric wires, consisting of two funnel-shaped cups, placed one over the other and supported by a pin, thus providing a free air-space between; the *petticoat i.*, a form in which the base is outspread and enlarged; the *pigtail i.*, which has a piece of twisted wire molded in at the top; the *shackle i.*, an unusually strong form used for insulating overhead wires; the *slot i.*, made in the form of a ring, the electric wire passing through the center; the *strain i.*, one used between an electric wire and the wire which supports it; and the *umbrella i.*, one having an umbrella-like top to protect the base from the rain.

In the Tariff Information Survey of paragraph 167, Tariff Act of 1913, on "The Electrical Industry," the following appears on p. 61:

> *Insulators*. In addition to the articles mentioned above, which have both insulating and current carrying parts, there is a class of articles used only as insulating supports or protection for electric circuits. Most important in this class are line insulators, used for supporting wires and cables on pole lines, to prevent the escape of current. They may be of glass or porcelain; glass is often used for the lighter lines, especially for telegraph and telephone lines, on account of its cheapness, but porcelain is in general use for the heavier lines and for those of high pressure, on account of its better mechanical characteristics. Insulators are of several types; the pin type has a hole to receive a wooden or metal pin, which is cemented to the insulator, and bolted to the cross-arm; the suspension type for higher voltages is made in the form of specially shaped disks, suspended one from another, the cable being suspended from the lowest. Other forms of insulators are the small porcelain knobs and cleats and unglazed tubes used in interior wiring, and for carrying wires over buildings, and bushings; some, of large size, are used to protect the terminals of electrical apparatus, such as transformers and circuit breakers. While the construction of insulators appears simple, they have been made the subject of exhaustive research and mathematical calculation.

Tariff statutes have used both the term "insulators" and the term "insulating materials." The Tariff Acts of 1922 and 1930 provided

for "molded insulators and insulating materials" of rubber or gutta-percha (paragraphs 1439 and 1537(b), respectively), and for "Electrical insulators and other articles" of shellac, copal or synthetic resin (paragraph 1441, Tariff Act of 1922) or of shellac or copal (paragraph 1539(a), Tariff Act of 1930).

In the Tariff Schedules of the United States, it is stated in headnote 1, schedule 6, part 5, that said part does not cover "electrical insulators or insulating materials (classifiable in other schedules according to materials of which made)." Item 535.11 of part 2 of schedule 5 provides for "Porcelain insulators, with metal parts cemented thereto and comprising not less than 30 percent of the weight thereof, used in high-voltage, low-frequency electrical systems" and the superior heading to items 547.41–547.43 covers "Glass electric insulators with or without fittings." These items obviously refer to devices or equipment and not materials.

Items 773.30–773.31 cover "Electric insulators, of rubber or plastics." These items were discussed in the Summaries of Trade and Tariff Information, 1968, schedule 7, volume 7, p. 133, wherein it is stated that electric insulators are made in many shapes and sizes and are used to support charged conductors and to prevent them from contact with one another or from grounding. While not controlling, this statement is in accord with the prior construction placed on the term "insulators" by the Tariff Commission and that evidenced by Congress in the language used in items 535.11 and 547.41–547.43, and may be given some weight. *Cf. American Bristle & Hair Drawing Co., Keer, Maurer & Co.* v. *United States*, 59 CCPA 104, C.A.D. 1048 (1972) ; *F. B. Vandegrift & Co., Inc.* v. *United States*, 65 Cust. Ct. 260, C.D. 4086 (1970), *aff'd sub nom., United States* v. *F. B. Vandegrift & Co., Inc.*, 59 CCPA 62, C.A.D. 1039, 468 F. 2d 1400 (1972) ; *Border Brokerage Company Inc.*, v. *United States*, 64 Cust. Ct. 331, C.D. 3999 (1970).

It appears, therefore, that the term "insulators" in tariff acts has been used in its narrower and more specific sense. That is the meaning given to the word by defendant's witnesses. They did not consider electrical tape used for insulating purposes to be an insulator, but confined that term to particular pieces of equipment made to insulate and support wires, bought and sold under the name of insulator, While plaintiff's witness considered the imported tape to be an insulator, he was using the term in its broader sense, including materials.

I conclude that an insulator in trade and commerce and in tariff acts is something distinct from insulation or insulating material. The former is a specific device or piece of equipment known in the

trade as an insulator. The latter is material used for insulating purposes or from which an insulator may be made. The imported tape is still material, even though it has been produced from other insulating materials. It is not a piece of equipment, and, while chiefly used for insulation, it must be cut for each job, and, as imported, choices remain as to the particular use for which it may be selected. *Bailey-Mora Company, Inc., et al.* v. *United States,* 57 Cust. Ct. 99, 109, C.D. 2737 (1966) ; *American Import Co.* v. *United States,* 26 CCPA 72, T.D. 49612 (1938) ; *The Harding Co. et al.* v. *United States,* 23 CCPA 250, T.D. 48109 (1936) ; *F. H. Paul & Stein Bros., Inc.* v. *United States,* 44 Cust Ct. 130, C.D. 2166 (1960), *appeal dismissed,* 47 CCPA 173 (1960).

That Congress intended pressure-sensitive electrical tape to be classified as pressure-sensitive tape is evidenced by the following from the Tariff Classification Study of November 15, 1960, which is a recognized source of Congressional meaning. *United States* v. *Andrew Fisher Cycle Co., Inc.,* 57 CCPA 102, C.A.D. 986, 426 F. 2d 1308 (1970) ; *Western Wire Works, Inc.* v. *United States,* 59 CCPA 5, C.A.D. 1025 (1971). It is stated in schedule 7, p. 472 :

> Item 790.55 would provide for pressure-sensitive tapes and other pressure-sensitive articles (other than those provided for in item 790.50). The principal tapes that would be included in this provision are cellophane tape, *friction tape,* rubber tape, and vinyl plastic tape. These tapes are not currently provided for as such and therefore are dutiable on the basis of component material of chief value. * * * [Emphasis supplied.]

Friction tape is defined as "cotton tape impregnated with water-resistant insulating material and an adhesive and used esp. to protect, insulate, and support electrical conductors—called also *electric tape.*" *Webster's Third New International Dictionary.*

When item 790.55 was before the Tariff Commission for consideration, a written statement was presented by the Pressure Sensitive Tape Council, a trade association of domestic manufacturers, in which insulating tapes and electrical tapes were included among various kinds of pressure-sensitive tapes and it was urged that pressure-sensitive tape of all types be included in a single paragraph in a single schedule. Tariff Classification Study, schedule 7, pp. 765–768. No exceptions were included in the item as prepared by the Tariff Commission and as adopted by Congress. When the provision for electric insulators of rubber or plastics was added (Third Supplemental Report, Tariff Classification Study, May 7, 1963, p. 73), neither insulating materials nor electrical pressure-sensitive tapes were included.

For the reasons stated, I hold that the the electrical pressure-sensitive tapes involved herein are insulating material and not the type of product intended by Congress to be covered by the provision for electrical insulators, but were intended to be classified as pressure-sensitive tape and assessed with duty under item 790.55.

The action is dismissed. Judgment will be rendered accordingly.